UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


UNITED STATES OF AMERICA,     )
                              )
         Plaintiff,        )
                              )
v.                            )        No. 3:08-CR-135
                              )        (VARLAN/GUYTON)
LESLIE BENSON,         )
                              )
         Defendant.     )


## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. Defendant Leslie Benson ("the Defendant") was charged in an Indictment [Doc. 1] on September 3, 2008, with knowingly, intentionally, and without authority possessing, with the intent to distribute, fifty grams or more of a mixture containing a detectable amount of cocaine base, also known as "crack," in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).

On December 18, 2008, the Defendant, through counsel Attorney Elizabeth Ford, filed a Motion to Suppress Evidence [Doc. 11]. On March 23, 2009, the Defendant advised the Court that he wished to withdraw his motion, and it was accordingly denied as moot with express permission to re-file if necessary. [Doc. 16]. On November 17, 2009, the Defendant, through new counsel Attorney Andy Roskind, filed a new Motion to Suppress Evidence [Doc. 27] that adopted by

reference the original mooted Motion to Suppress Evidence [Doc. 11].[1]

The parties appeared before the undersigned for a hearing on the Defendant's Motion on February 11, 2010. Assistant United States Attorney David Lewen was present on behalf of the Government. Attorney Roskind represented the Defendant, who was also present. At the hearing, the Government called two witnesses, Officer Richard Wallace and Officer John Martin of the Knoxville Police Department. The Defendant called one witness, Mr. Jim Murray, and proffered him as an expert in police procedures during traffic stops. The Defendant also testified on his own behalf. At the conclusion of the February 11 suppression hearing, Attorney Roskind had not completed direct examination of Mr. Murray. The Court therefore continued the hearing to March 10, 2010.

On March 9, 2010, the Defendant filed a Motion to Continue the suppression hearing. [Doc. 34]. The Court heard arguments on the Motion to Continue on March 10, 2010, at the time originally scheduled for the suppression hearing. Assistant United States Attorney Lewen appeared on behalf of the Government. Attorney Roskind appeared on behalf of the Defendant, who was also present. At the hearing, the Defendant orally moved to withdraw Mr. Murray as a witness. The Court granted the oral motion and ordered that Mr. Murray's testimony be struck from the record and given no effect. [Doc. 37]. The Court also granted the Motion to Continue, and the suppression hearing was further continued to April 14, 2010. [Doc. 37].

On April 14, 2010, the parties appeared before the undersigned to conclude the suppression hearing. Neither the Defendant nor the Government called witnesses or presented evidence.

---

[1] Citations to the Defendant's arguments advanced in his now pending Motion to Suppress Evidence [Doc. 27] are hereinafter made to the pagination in the original Motion to Suppress Evidence [Doc. 11].

Instead, the Defendant requested that he be allowed thirty days to file a post-hearing brief in support of his Motion to Suppress. The Court granted the Defendant until May 12, 2010, to file a brief, and the Government until May 26, 2010, to file any response. [Doc. 39]. On May 12, 2010, the Defendant filed a Brief in Support of Motion to Suppress [Doc. 40]. On May 20, 2010, the Government filed a Response [Doc. 41].

## I.        POSITIONS OF THE PARTIES

The Defendant's Motion to Suppress asks the Court to suppress all evidence that was obtained in this case as a result of the July 25, 2008, traffic stop of the Defendant's vehicle. [Doc. 11 at 1]. The Motion also seeks suppression of "any and all statements made, or alleged to [have been] made, by [the] Defendant" concerning the case. [Doc. 11 at 1]. The Defendant alleges that he was detained at the scene of the lawful traffic stop for an additional period of time after "the purposes of the traffic stop were completed," [Doc. 11 at 3], and he argues that this extended detention was a seizure of his person that violated the Fourth Amendment. See [Doc. 40 at 8] ("As the officers cannot credibly articulate any notions of reasonable suspicion that Mr. Benson was involved in criminal activity during the initial traffic stop, his prolonged detention was unconstitutional and thus all evidence should be suppressed."). The Defendant argues that the police officers conducting the traffic stop did not have reasonable suspicion that he "possessed any weapons or illegal contraband," [Doc. 11 at 1], or that "criminal activity was afoot," [Doc. 11 at 3]. The Defendant further argues that neither probable cause nor reasonable suspicion existed to justify the pat down of his person and his subsequent arrest. Accordingly, the Defendant argues that the pat down and the arrest violated the Fourth Amendment, and any evidence obtained therefrom

should be suppressed.  [Doc. 11 at 2].

In response, the Government argues that the police did not prolong the lawful traffic stop beyond the time that was necessary to interview the Defendant, check the police database for information about the Defendant, and investigate their reasonable suspicion that the Defendant was engaged in criminal activity.  See [Doc. 41 at 2 n.2].  The Government alleges that one of the police officers conducting the stop, Officer Martin, observed the Defendant shove an object into the front of his pants while he was still seated in the driver's seat of his vehicle.  The Government contends that once this observation was made, the officers' subsequent conduct was lawful under either of the following two theories.  First, the Government argues that Officer Martin's observation made he and Officer Wallace reasonably suspicious that the Defendant was engaged in criminal activity, and therefore justified removing the Defendant from his vehicle for a limited pat down of his outer clothing.  [Doc. 12 at 5-6].  Second, the Government argues that Officer Martin's observation provided the police with probable cause to remove the Defendant from his vehicle for a full search of his person.  [Doc. 12 at 5] ("[O]nce stopped, the Defendant immediately created additional reasonable suspicion *and* probable cause.") (emphasis added); [Doc 41 at 4] ("the officers had probable cause to arrest Defendant for possession of contraband, namely narcotics, and Defendant was searched incident to that arrest"); [Doc. 41 at 4 n.4] ("A search is a  valid search incident to a lawful arrest even if it precedes the arrest, so long as (1) there was probable cause for the arrest at the time of the search, and (2) the arrest followed 'quickly on the heels of the challenged search.'") (quoting Rawlings v. Kentucky, 448 U.S. 98, 111 (1980)).  The Government contends that either theory establishes that the police did not violate the Fourth Amendment.

The Government also contends that any statements made by the Defendant during and after

-4-

his arrest should not be suppressed because "before answering any questions, [the] Defendant first gave officers both a verbal and a written knowing, voluntary, and intelligent waiver" of his constitutional rights as interpreted by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). [Doc. 12 at 7]; [Exhibit 5].

## II.    FACTS

Based on the testimony and evidence presented at the suppression hearing on February 11, 2010, the Court makes the following factual findings. On July 25, 2008, at approximately 11:00 p.m., Officer Richard Wallace and Officer John Martin of the Knoxville Police Department were traveling together in a cruiser eastbound on Washington Avenue in East Knoxville, Tennessee. The officers were conducting a routine patrol of the neighborhood. While traveling on the 2700 block of Washington Avenue between North Harrison Street and Mundy Street, Officer Wallace, who was driving the cruiser, looked to his left and observed a stationary Cadillac driven by the Defendant in the middle of the next parallel avenue to the northwest, Nichols Avenue.[2] Officer Wallace testified that the Cadillac was "stopped in the middle of the road" directly in front of 2802 Nichols Avenue. [Tr. 11]. Officer Wallace testified that 2802 Nichols Avenue was known to him to be a "drug house," i.e., a residence where "a lot of drug transactions [occur]" and "drugs [are] smoked." [Tr. 13]. Officer Wallace also testified that the neighborhood surrounding 2802 Nichols Avenue was

---

[2] See Exhibit 1 for a detailed map of the area. When Officer Wallace first observed the Cadillac, his cruiser was in front of the lot marked as number 34 on the map. His line of sight went across lot 34 to the northeast of the residence marked as number 2729, across the lot outlined in green and marked as number 13 to the northeast of the unmarked residence, and into Nichols Avenue. Officer Wallace testified that the address of the unmarked residence situated on lot 13 is 2802 Nichols Avenue. [Tr. 13].

both "a well-known drug area" and "a high crime area." [Tr. 14].

Officer Wallace was immediately suspicious of the stationary Cadillac, and he decided to drive around the block and onto Nichols Avenue to investigate why the vehicle was stopped in the middle of the road. Officer Wallace testified that his prior experience led him to believe that the Cadillac was stopped because its driver was participating in a drug transaction. [Tr. 14]. Officer Wallace drove down Washington Avenue and made a left turn onto Mundy Street.[3] [Tr. 14]. He continued on Mundy Street until making a left turn onto Nichols Avenue. [Tr. 14]. Officer Wallace testified that "[o]nce we turned–actually made the lefthand turn westbound onto Nichols Avenue–[I] could see [a] pedestrian, someone on foot, at the [front] driver-side window of the Defendant's vehicle." [Tr. 15]. Officer Martin also testified that he observed "what appeared to be a male" standing at the front driver-side window of the Cadillac. [Tr. 80]. Officer Wallace testified that the observation of the pedestrian "kind of confirmed that our suspicion was correct that there was a drug transaction taking place." [Tr. 15].

Officer Wallace testified that as soon as he turned left onto Nichols Avenue and began to drive toward the rear of the stopped Cadillac, "[t]he pedestrian walked off at a very brisk pace back towards [the house at] the address 2802." [Tr. 15]. Officer Martin testified that the pedestrian "turned his body as so to look at us, and then left the [Cadillac] out of sight–got out of sight as quick

_____

[3] A video recording [Exhibit 2] made with the camera mounted above the dashboard in Officer Wallace's police cruiser begins as Officer Wallace is driving northwest on Mundy Street. The video recording begins at 11:02:32 p.m. on July 25, 2008. The time stamp on the video displays the time at the start of the video as 22:02:32, but both Officer Wallace and Officer Martin testified that the time stamp was one hour behind the actual time. [Tr. 17-18, 84]. Hereinafter all references to the timing of events depicted on the video recording have been adjusted to reflect this one hour difference.

as possible." [Tr. 80].

As the police approached the stationary Cadillac, the Defendant drove off down Nichols Avenue. Officer Wallace described the Cadillac's movement as an "unprovoked departure." [Tr. 16]. Officer Wallace testified that the Cadillac was not displaying "brake lights or tail lights," and that there were "no lights to the rear of the vehicle."[4] [Tr. 18-19]. Officer Wallace also testified that the failure to display brake lights or tail lights is a traffic violation in Tennessee. [Tr. 19].

Officer Wallace followed the Cadillac as it turned left from Nichols Avenue onto North Harrison Street. Officer Wallace testified that no turn indicator light was displayed on the Cadillac prior to the left turn.[5] [Tr. 50]. Officer Wallace decided to initiate a traffic stop to investigate the absence of functioning brake and tail lights on the Cadillac. [Tr. 19, 50]. At 11:02:53 p.m., Officer Wallace activated both the blue emergency lights and the forward spotlight on top of his cruiser. [Exhibit 2]. The Defendant immediately stopped the Cadillac on North Harrison Street just before the intersection with Washington Avenue.

Both officers approached the Cadillac. Officer Wallace was the "contact officer," and he approached the driver-side of the vehicle and spoke to the Defendant through the open front driver-side window. [Tr. 20]; [Exhibit 2]. Officer Martin was the "cover officer," and he approached the rear passenger-side window of the Cadillac and remained there observing the passenger compartment and the Defendant. [Tr. 20, 22, 82]; [Exhibit 2]. Officer Wallace informed the

---

[4] In response to questioning from the Court at the February 11, 2010, suppression hearing, Defense counsel acknowledged that the Cadillac's rear lights were not functioning: "It's not an issue that the taillights weren't on . . . The taillights were not on." [Tr. 133].

[5] The Government points out that the failure to utilize an illuminated turn signal prior to executing a turn was a violation of Tenn. Code Ann. § 55-8-143. [Doc. 12 at 4].

Defendant that he had been stopped because his brake and tail lights appeared to be out, and he asked the Defendant for his driver's license and insurance information. [Tr. 52-55]. Officer Wallace also asked the Defendant what he was doing in the area. [Tr. 52]. This initial conversation lasted approximately one minute and twenty-five seconds.[6] Officer Wallace testified that during this initial conversation the Defendant "seemed to be nervous, had sweat on his forehead, shaking hands, [and] a very stuttered speech, a nervous speech." [Tr. 21]. Officer Martin testified that the Defendant "appeared much more nervous than a reasonable person would on a routine traffic stop of a minor violation." [Tr. 82].

Officer Wallace returned to his cruiser to check the Defendant's driver's license against information in the police computer database. Officer Martin followed Officer Wallace back to the cruiser, and the two conversed about the situation for about twenty-five seconds. [Exhibit 2]. Then, while Officer Wallace checked the police database, Officer Martin returned to his vantage just behind the rear passenger-side door of the Cadillac. Officer Martin testified that he looked through the rear passenger window and observed that the Defendant had his "pants open," and that the pants were "unbuttoned and unzipped." [Tr. 84, 91]. Officer Martin testified that he also observed that the Defendant was clutching an object in a manner "similar to holding a baseball." [Tr. 84]. Officer Martin stated that the object "appeared to be a clear plastic baggie." [Tr. 84]. He explained that he saw "clear plastic" between the Defendant's fingers as the Defendant clutched the object. [Tr. 84]. Officer Martin testified that he watched the Defendant shove the object "down the front of his pants" into "his crotch area," zip and button the pants, and then return to "a resting position [sitting] in the

---

[6] The video recording [Exhibit 2] shows that the initial exchange between Officer Wallace and the Defendant began at 11:03:15 p.m. and ended at 11:04:40 p.m.

vehicle." [Tr. 85-86]. Officer Martin did not see what the object was, but he believed it to be "a clear plastic baggie containing narcotics." [Tr. 85]. He testified that he believed the Defendant "was concealing illegal narcotics on his person." [Tr. 86].

After observing the Defendant for about twenty seconds, Officer Martin returned to the police cruiser and informed Officer Wallace of what he had seen.[7] Officer Wallace testified that Officer Martin told him that he watched the Defendant "grab something into his right hand which was displaying clear plastic baggie type material, take it, and shove it down the front of his pants, zip his pants, and button his pants back up." [Tr. 23]. The two officers conversed for about thirty seconds, and then Officer Martin returned to his "cover" position next to the passenger-side rear tire of the Cadillac.[8] Officer Wallace testified that his check of the police database was incomplete at this point. [Tr. 59]. After another thirty seconds, Officer Wallace returned to the front driver-side window of the Cadillac and spoke to the Defendant.[9] Officer Wallace testified that he had waited to return to the Defendant until the database check was complete. [Tr. 23].

Officer Wallace asked the Defendant what he was doing, where he was coming from, where he was heading, why he was in the neighborhood, and some other investigative questions. [Tr. 24, 60]. This conversation lasted approximately one minute and forty-one seconds.[10] Officer Wallace

---

[7] Officer Martin observed the Defendant from approximately 11:05:05 p.m. to 11:05:23 p.m., at which point he returned to the police cruiser. [Exhibit 2].

[8] While watching the video recording on cross-examination, Officer Wallace specifically testified that at 11:05:29 p.m. Officer Martin told him that he had just seen the Defendant shove something of "about baseball size" down his pants. [Tr. 56]. Officer Martin returned to his cover position by the Defendant's vehicle at 11:05:53 p.m. [Exhibit 2].

[9] Officer Wallace re-engaged the Defendant in conversation at 11:06:32 p.m. [Exhibit 2].

[10] Officer Wallace spoke with the Defendant from 11:06:32 p.m. to 11:08:13 p.m. [Exhibit 2].

testified that it was "a very nervous conversation." [Tr. 24]. Officer Wallace also testified that the Defendant was unable to provide answers to simple questions: "[The Defendant] stated that he had dropped his stepson off at an address that he couldn't give me. [He] couldn't give me a name of the stepson. He had to fumble around to think of a name." [Tr. 24].

At the end of this conversation, Officer Wallace and Officer Martin walked behind the Defendant's vehicle to discuss "the best way to get the defendant out of the vehicle" safely. [Tr. 25, 61]. At approximately 11:09 p.m., Officer Wallace asked the Defendant to exit the vehicle, and he did so. [Exhibit 2]. Both Officer Wallace and Officer Martin testified that they smelled the odor of marijuana emanating from within the car as soon as the Defendant opened the door and stepped out. [Tr. 25, 98-99].

Officer Wallace instructed the Defendant to place his hands on the roof of the Cadillac and spread his legs. [Tr. 63]; [Exhibit 2]. Officer Wallace testified that he asked for and was granted the Defendant's consent to a pat down. [Tr. 66, 68, 76-77]. Officer Wallace then held the waistband of the Defendant's pants and shook the pants for about twenty seconds. [Exhibit 2]. Officer Wallace testified that he checked the Defendant's waistband and shook his pants because the waistband and the groin are "high potential area[s] where a weapon could be hidden." [Tr. 65]. He explained that he focused on the Defendant's waistband because "it's a danger area," and because Officer Martin had seen the Defendant "shove something down the front of his pants." [Tr. 76]. After shaking the Defendant's pants, Officer Wallace bent down to pat the Defendant's ankles and check the cuffs of his pants. [Exhibit 2]. As Officer Wallace rose to stand, he patted the Defendant's left leg for approximately two seconds. [Tr. 69]; [Exhibit 2].

Officer Wallace testified that during the pat down he felt "a large bulge" in the Defendant's

crotch.  [Tr. 26].  He stated that the object causing the bulge was in "a very private area," and that it felt like a bag of narcotics.  [Tr. 27].  Officer Wallace testified that the object "wasn't attached" to the Defendant's person, and that it "was actually in the middle of [the Defendant's] two legs in his crotch, in his groin area."  [Tr. 69].  Officer Wallace explained as follows:  "I didn't fondle [the object].  Once I recognized that, you know, it was a texture of, you know, drugs or narcotics, I immediately stopped [the pat down] and handcuffed [the Defendant]."  [Tr. 27].

Officer Wallace handcuffed the Defendant and then searched his pockets.  Officer Wallace discovered $1,366 in cash on the Defendant's person.[11]  Officer Wallace then prepared to recover the unknown object from inside the crotch of the Defendant's pants by putting on a pair of rubber gloves.  [Tr. 27]; [Exhibit 2].  At this point, the Defendant offered to remove the object from his pants and surrender it.  [Tr. 27-28]; [Exhibit 2].  He told Officer Wallace, "I'll get 'em for you."  [Tr. 28].  Officer Wallace uncuffed the Defendant, and the Defendant opened the fly of his pants, reached inside with one hand, and removed two plastic baggies.  [Exhibits 2 and 3].  One baggie contained 63.3 grams of cocaine base, and the other baggie contained 3.3 grams of marijuana.  [Exhibits 3 and 6].

III.   ANALYSIS

It is uncontested that the initial traffic stop of the Defendant's Cadillac was lawful in this

---

[11] Officer Wallace testified at the hearing that he discovered "a little over $1,600 or $1,800" in cash on the Defendant's person.  [Tr. 30].  But the Government alleges in its response that the search of the Defendant's person "yielded $1,366 cash in denominations consistent with drug trafficking," [Doc. 12 at 2], and Officer Wallace's Affidavit of Complaint [Exhibit 6] sworn on July 26, 2008, states that "$1,366.00 was seized."

case.[12] The parties acknowledge, and the Court finds, that Officers Wallace and Martin had probable cause to believe that the Defendant had committed at least one traffic violation: the failure to display a turn signal. See Tenn. Code Ann. § 55-8-143. Accordingly, the initial stop of the Defendant's vehicle was lawful. See Whren v. United States, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred."); United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002) ("A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct.") (citation omitted); United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999), cert. denied, 528 U.S. 1176 (2000) ("an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle").

The Defendant contends that the police began to violate his Fourth Amendment rights when they prolonged his detention beyond the time period necessary to investigate and ticket any traffic violations that he may have committed. The Defendant argues that the prolongation of his detention amounted to an unreasonable seizure of his person.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S.

_____

[12] At the February 11, 2010, suppression hearing, the Court specifically asked defense counsel if the Defendant acknowledged the lawfulness of the initial traffic stop:

| THE COURT: | The stop itself is not at issue, correct? |
| MR. ROSKIND: | The traffic stop is not. |

[Tr. 162].

Const. amend IV.  A "seizure" of a person within the meaning of the Fourth Amendment occurs when a police officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968).  "The test for the existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." California v. Hodari, D., 499 U.S. 621, 628 (1991).  In United States v. Mendenhall, 446 U.S. 544, 554 (1980), the Supreme Court established the definitive rule that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

"The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" Brendlin v. California, 551 U.S. 249, 255 (2007) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)); see also Arizona v. Johnson, 555 U.S. __, 129 S. Ct. 781, 783 (2009) ("a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will") (citation omitted); Whren, 517 U.S. at 809-10 ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period of time and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the [Fourth Amendment]."); Colorado v. Bannister, 449 U.S. 1, 4 n.3 (1980) ("There can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment.").

In this case, it is clear that the Defendant was seized within the meaning of the Fourth Amendment for the entire period of time "from the moment [his] car came to a halt on the side of

the road," Brendlin, 551 U.S. at 263, until he was arrested. A reasonable person in the Defendant's shoes would not have felt free to leave at any point during this period of time. Indeed, Officer Wallace specifically testified that the Defendant was not free to leave because he "was still conducting a traffic stop" for the entire period of time leading up to the Defendant's arrest. [Tr. 63-64]. The question for the Court's resolution is whether the seizure of the Defendant became unreasonable at any point between the initial stop and his arrest.

After initiating a traffic stop, a police officer may not seize a driver "any longer than is reasonably necessary to issue the traffic citation" unless he has "reasonable suspicion that the [driver] has engaged in more extensive criminal conduct." Townsend, 305 F.3d at 541; see also Hill, 195 F.3d at 264 ("Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."). If a police officer does not have reasonable suspicion that the driver "is, or is about to be, engaged in criminal activity," United States v. Cortez, 449 U.S. 411, 417 (1981), beyond the traffic violation for which he was stopped, then all of the officer's actions during the course of the seizure of the driver must be reasonably related in scope to the circumstances justifying the original stop. Townsend, 305 F.3d at 541 (citing Hill, 195 F.3d at 264 (during an ordinary traffic stop "any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference")).

In this case, the Defendant argues that Officer Wallace and Officer Martin unlawfully prolonged his detention beyond the time necessary to investigate and ticket any traffic violations he may have committed. The Court disagrees. The period of time from the initial stop of the

Defendant to his arrest was approximately six minutes and forty seconds.[13]  By any measure, this

was a traffic stop of reasonable duration.  The officers did nothing unusual to prolong the stop.  Until

they made the decision to remove the Defendant from his vehicle, Officer Wallace and Officer

Martin had merely observed the Defendant, asked him basic investigatory questions, and checked

his identifying and insurance information against the police database.  None of these activities were

unreasonable or unlawful.  See United States v. Burton, 334 F.3d 514, 519 (6th Cir. 2003)

("Particularly where, as here, the traffic stop took place on a street known to the police as a high-

crime area, we believe that asking a few questions about illegal activity to the driver of an

automobile stopped for a traffic violation at 11:30 p.m. is not unreasonable.") (citation omitted);

United States v. Childs, 277 F.3d 947, 954 (7th Cir.) (en banc), cert. denied, 537 U.S. 829 (2002)

("Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn

reasonable detention into unreasonable detention.  They do not signal or facilitate oppressive police

tactics that may burden the public–for all suspects (even the guilty ones) may protect themselves

fully by declining to answer.  Nor do the questions forcibly invade any privacy interest or extract

information without the suspect's consent."); United States v. Bell, 555 F.3d 535, 542 (6th Cir.

2009) (explaining that when officers are already waiting for the results of a background check during

a traffic stop, their pursuit of other investigatory matters while the background check is processing

does not extend the length of the stop, "even if those matters [are] unrelated to the original purpose

of the stop").

    Officer Wallace testified that the database check of the Defendant's identifying information

---

[13]  The Defendant stopped his car at approximately 11:03 p.m. and he was placed in
handcuffs and arrested at approximately 11:09:40 p.m.  [Exhibit 2].

was not complete until approximately 11:06:30 p.m. See [Tr. 23, 59]; [Exhibit 2]. It was reasonable for Officer Wallace to wait until he had completed a standard background check to decide how to proceed with the Defendant's detention. See United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999) ("an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks . . . because this activity would be well within the bounds of the initial stop") (internal quotation omitted). After the routine database check was complete at around 11:06:30 p.m., the Defendant was detained only an additional three minutes and ten seconds before he was handcuffed and placed under arrest. [Exhibit 2]. During this period of time, Officers Wallace and Martin engaged in the following activities: (1) Officer Wallace further questioned the Defendant for approximately one minute and forty-one seconds (11:06:32 p.m. to 11:08:13 p.m.); (2) Officer Wallace and Officer Martin conferred about the best way to remove the Defendant from the vehicle for approximately nineteen seconds (11:08:13 p.m. to 11:08:32 p.m.); (3) Officer Wallace spoke to the Defendant and asked him to exit the vehicle (11:08:32 p.m. to 11:09 p.m.); (4) Officer Wallace conducted a basic pat down of the Defendant's person that included untucking the Defendant's shirt and shaking the waistband of his pants (11:09 p.m. to 11:09:40); and (5) Officer Wallace handcuffed the Defendant and placed him under arrest. [Exhibit 2].

The Court construes the Defendant's argument that the traffic stop was unlawfully "prolonged," [Doc. 40 at 8], as an argument that it was unreasonable for Officers Wallace and Martin to engage in any of the five activities detailed above. The Defendant essentially contends that because Officers Wallace and Martin did not have reasonable suspicion that he was engaged in criminal activity, they were not permitted to take any further investigatory action after the completion of the database check at around 11:06:30 p.m. [Doc. 40 at 4] ("as testified to, Mr.

Benson had proper documentation, and the officers had no reason to detain him further but for their alleged observations and misguided suspicions"). The Defendant argues that lawful police action at this point was limited to immediately issuing him a ticket for his traffic violations and allowing him to leave. Again, the Court disagrees.

The Court finds that at the time the database check was complete, Officers Wallace and Martin had more than reasonable suspicion that the Defendant was engaged in criminal activity; they had probable cause to arrest the Defendant for possession of contraband. The officers gained probable cause to believe that the Defendant was in possession of contraband as soon as Officer Martin observed the Defendant shove an object into the front of his pants–i.e., somewhere between 11:05:05 p.m. and 11:05:23 p.m. [Exhibit 2]; see n.7, *supra*. For the following reasons, the Court finds that (1) Officer Martin's observation of the Defendant, in combination with all of the other circumstances surrounding the traffic stop, provided the police with probable cause to believe that the Defendant was committing a criminal offense, i.e., possessing contraband, and (2) the existence of probable cause lawfully gave Officers Wallace and Martin the power to arrest the Defendant *and* the lesser included power to search his person incident to arrest.

A police officer is permitted to make a warrantless public arrest when, based upon the totality of the circumstances, there is probable cause to believe that the arrestee is committing or has committed a criminal offense. Devenpeck v. Alford, 543 U.S. 146, 152 (2004); see Illinois v. Gates, 462 U.S. 213, 230-31 (1983) (explaining that a probable cause determination must be made with a "totality-of-the-circumstances approach"). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion[.]" United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). "[P]robable cause is a fluid concept–turning on the

assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232. These probabilities "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. at 231.

When a police officer makes a lawful custodial arrest based on probable cause, he is permitted to search the arrestee's person without a warrant as an incident to the arrest. Arizona v. Gant, 556 U.S. __, 129 S. Ct. 1710, 1716 (2009); see United States v. Robinson, 414 U.S. 218, 235 (1973) (in the case of a lawful custodial arrest, "a full search" of the arrestee's person is reasonable under the Fourth Amendment without any additional justification); Weeks v. United States, 232 U.S. 383, 392 (1914) (stating that the right of the Government to search the person of an accused when he is legally arrested was "always recognized under English and American law" and had been "uniformly maintained in many cases").

"[T]he search-incident-to-a-lawful-arrest rule also permits an officer to conduct a full search of an arrestee's person *before* he is placed under lawful custodial arrest as long as the formal arrest follows quickly on the heels of the challenged search of his person and the fruits of that search are not necessary to sustain the probable cause to arrest him." United States v. Montgomery, 377 F.3d 582, 586 (2004) (emphasis original) (internal quotation omitted). "[T]he authority to conduct a search incident to arrest vests 'once the police [have] probable cause [to arrest a person]' and *not* necessarily at the point of arrest." Evans v. Solomon, 681 F. Supp. 2d 233, 249 (E.D.N.Y. 2010) (emphasis added) (quoting United States v. Scopo, 19 F.3d 777, 782 (2d Cir. 1994)). Accordingly, if a police officer has probable cause to arrest a suspect, the officer may lawfully conduct a warrantless full search of the suspect's person as an incident to arrest even when the suspect is "not

under formal or *de facto* arrest at the time of the search," Evans, 681 F. Supp. 2d at 248; see also Rawlings v. Kentucky, 488 U.S. 97, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."); United States v. Frazier, 249 Fed. App'x 396, 403 (6th Cir. 2007) ("a search incident to arrest is proper prior to formal arrest, so long as the police already have probable cause prior to the search, and a formal arrest follows closely on the heels of the search") (citation omitted); United States v. Lucas, 360 F.2d 937, 938 (6th Cir. 1966) ("a search without a warrant may precede an arrest as long as it is substantially contemporaneous with the same and the arrest is based on probable cause and not on the results of the search") (citations omitted); accord United States v. Jenkins, 496 F.2d 57, 73 (2d Cir. 1974) ("The mere fact that the trooper reversed the procedure, conducting the search before the arrest, did not render it illegal as long as probable cause existed at the time of the search . . . Any other holding would, without rational basis, exalt form over substance.") (citations omitted). In other words, whenever a police officer is empowered by the existence of probable cause to arrest a suspect and subsequently subject him to a full search incident to arrest, the officer also has "the lesser power to search [the suspect]'s person," Evans, 681 F. Supp. 2d at 248, immediately.

In this case, the Court finds that Officers Wallace and Martin had probable cause to arrest the Defendant for unlawful possession of contraband as soon as Officer Martin observed the Defendant shove an object into his pants. The Court finds that three factors articulated by Officers Wallace and Martin combined to establish probable cause to believe that the Defendant was in possession of contraband.

First, the officers came upon the Defendant's Cadillac as it was stopped late at night in front

of a known "drug house," [Tr. 13], located in a neighborhood that was both "a well-known drug area," and "a high crime area," [Tr. 14]. The Defendant did not challenge the officers' testimony on this point, and the Court finds that testimony to be credible. It is well-established that the location where a suspect is first observed and the location where he is stopped are relevant factors in a probable cause analysis. See, e.g., United States v. Hughes, 898 F.2d 63, 64 (6th Cir. 1990) ("the presence of a suspect in a neighborhood notorious for drug trafficking" is a factor "which should be assayed in determining whether 'the totality of the circumstances' provides probable cause in a drug case") (citing United States v. Green, 670 F.2d 1148, 1151-52 (D.C. Cir. 1981)); cf. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (stating that "the fact that [a] stop occurred in a 'high crime area' [is] among the relevant contextual considerations" in a reasonable suspicion analysis–an analysis that is closely akin to the probable cause analysis).

Second, the Defendant's nervous behavior during questioning by Officer Wallace certainly contributed to the formation of probable cause. See, e.g., United States v. Akins, 995 F. Supp. 797, 809 (6th Cir. 1998) (stating that a suspect's nervousness is a relevant factor to be considered in determining probable cause) (citing United States v. Baro, 15 F.3d 563, 568 (6th Cir. 1994)). Officer Wallace testified that the Defendant "seemed to be nervous, had sweat on his forehead, shaking hands, [and] a very stuttered speech, a nervous speech." [Tr. 21]. Officer Martin testified that the Defendant "appeared much more nervous than a reasonable person would on a routine traffic stop of a minor violation." [Tr. 82].

Third, and most importantly, the Court finds that it was reasonable for Officers Wallace and Martin to believe that the Defendant was concealing contraband on his person when he shoved an object into the front of his pants. The Court credits the testimony of Officer Martin that he observed

-20-

the Defendant shove an object that appeared to be a clear plastic bag "down the front of his pants"

into "his crotch area." [Tr. 85-86]. Officer Martin's testimony regarding his observation of the

Defendant was consistent, and, as the Government points out, it was corroborated by both the video

evidence and the testimony of Officer Wallace.[14] The Government is correct that from 11:05:07

---

[14] The consistency of Officer Martin's testimony is demonstrated below. On direct examination, Officer Martin testified as follows:

> I observed motion inside the vehicle. I approached the vehicle. I saw the Defendant with his pants open with what appeared to be clear plastic in his hand. I could see between his fingers the clear plastic.

[Tr. 84].

Later, on cross examination, Officer Martin offered precise answers and did not contradict his previous testimony:

> MR. ROSKIND: You testified that you saw him grab a large clear baggie?
>
> OFFICER MARTIN: I saw him with a clear baggie in his hand, yes, sir. I didn't see him grab it.
>
> MR. ROSKIND: Okay. And you saw him unbutton and unzip his pants?
>
> OFFICER MARTIN: No, sir. When I approached the vehicle, his pants were already unbuttoned and unzipped.

[Tr. 91].

The Court also notes that the Defendant does not directly challenge the credibility of Officer Martin's testimony regarding his observation of the Defendant. The Defendant's only comment on this testimony is to point out that "the video unequivocally shows Officer Martin standing approximately four feet away from Mr. Benson's car and slightly behind the passenger-side tire." [Doc. 40 at 4]. The Defendant does advance one argument against Officer Martin's overall credibility. He asserts that both Officer Martin's and Officer Wallace's testimony regarding a pedestrian at the window of his Cadillac while it was stopped on Nichols Avenue was "questionable at best" because "[t]he physical layout of the road, combined [with] the surrounding obstacles and darkness simply calls into question the officers' veracity." [Doc. 40 at

p.m. through 11:05:22 p.m., "Officer Martin can be seen looking, with unwavering attention, at what the Defendant is doing in his car." [Doc. 41 at 3]; [Exhibit 2]. And Officer Wallace testified that Officer Martin told him that he had seen the Defendant "grab something into his right hand which was displaying clear plastic baggie type material, take it, and shove it down the front of his pants, zip his pants, and button his pants back up." [Tr. 23]. The Court of Appeals for the Sixth Circuit has indicated that a police officer's observation during a traffic stop of a vehicle occupant making "movements like he [is] stuffing something in his pants" can provide probable cause for a full search of the occupant's person. Hemphill v. Haglund, 45 Fed. App'x 519, 520 (6th Cir. 2002) ("the officer clearly had probable cause to conduct the search once he observed Hemphill appearing to stuff something into his pants").

The Court concludes that the three factors set out above provided Officers Wallace and Martin with probable cause to believe that the Defendant was in possession of contraband. The officers' suspicion ripened into probable cause as soon as Officer Martin completed–at 11:05:23 p.m.–his observation of the Defendant shoving an object into his pants. The existence of probable cause to arrest the Defendant was further supported when the Defendant was unable to provide answers to simple questions during his second conversation with Officer Wallace, which lasted from 11:06:32 p.m. to 11:08:13 p.m. [Tr. 24]; [Exhibit 2].

Because Officers Wallace and Martin had probable cause to arrest the Defendant beginning at 11:05:23 p.m., all of their subsequent actions were reasonable within the meaning of the Fourth Amendment. As soon as Officer Martin saw the Defendant shove an object into his pants, he and

---

13]. This is the Defendant's only direct attack on Officer Martin's credibility. By contrast, the Defendant dedicates seven paragraphs of his memorandum to assailing the credibility of Officer Wallace. [Doc. 40 at 13-17].

Officer Wallace could have lawfully arrested the Defendant. Accordingly, the officers' actions in (1) asking the Defendant further questions after the completion of the database check, (2) conferring for a very short period of time in order to strategize about how to remove the Defendant from his vehicle, (3) removing the Defendant from his vehicle, (4) conducting a basic pat down, and (5) handcuffing the Defendant and placing him under arrest were reasonable.

The Defendant's assertion that Officer Wallace's basic pat down was in fact an "intrusive," [Doc. 40 at 14], full search of his person is inapposite.[15] As explained *supra*, at the time the basic pat down occurred, Officers Wallace and Martin already had probable cause to arrest the Defendant for possession of contraband. Thus, it was permissible for Officer Wallace to conduct a *full search* of the Defendant's person before placing him under arrest as long as formal arrest quickly followed. See Montgomery, 377 F.3d at 586. Since the Defendant was handcuffed and arrested *immediately* upon conclusion of the basic pat down, [Exhibit 2], whether the pat down was in fact a proper "Terry frisk" or something more intrusive is irrelevant.

As a final matter, the Court finds that the Defendant has not shown any reason for suppressing "any and all statements [he] made, or [is] alleged to [have] made" concerning the case. [Doc. 11 at 1]. The Defendant's Fourth Amendment rights were not violated at any point during the traffic stop on July 25, 2008, and the Defendant has offered no evidence or argument showing that the Knoxville Police Department's standard "Waiver of Rights" form [Exhibit 5] that he signed at

---

[15] The Defendant argues as follows: "Even [] assuming that everything the officers testified to is in fact the truth, Officer Wallace still violate[d] Mr. Benson's constitutional rights by yanking Mr. Benson's shirt and placing both of his hands inside Mr. Benson's pants. [Mr. Benson] was not under arrest and at most Officer Wallace could perform [a] frisk to determine if weapons were present. Simply put, Officer Wallace did not perform a Terry frisk as envisioned by our courts." [Doc. 40 at 16].

12:50 a.m. on July 26, 2008, is invalid.


IV.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Defendant's Motion to Suppress

Evidence **[Doc. 27]** be **DENIED**.[16]

Respectfully Submitted,


_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[16] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Fed'n of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).